J-S65004-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| S.B.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.E.B.-S. | : | No. 1412 MDA 2019 |

Appeal from the Order Entered July 23, 2019
In the Court of Common Pleas of Lycoming County
Civil Division at No(s):  FC-2009-0020268

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY PANELLA, P.J.:                **FILED FEBRUARY 21, 2020**

Appellant, S.B.B. ("Mother"), files this appeal from the order entered July 23, 2019, granting J.E.B.-S. ("Father")'s petition to temporarily modify the custody order entered August 10, 2016.  After careful review, we affirm.[1]

K.E.B. ("Child") was born in June 2008.  Mother and Father were never married.  Mother filed a complaint for custody on February 27, 2009.  Since that date, the parties, who have shared physical custody for the majority of Child's life, have been involved in numerous custody hearings and filings concerning legal and physical custody issues.

---

* Retired Senior Judge assigned to the Superior Court.

[1] During the pendency of this appeal, Mother has filed an application requesting that this Court obtain a transcript from a January 14, 2020 hearing that allegedly occurred in the trial court. As this transcript cannot have been any part of the basis of the order under review in this appeal, we deny Mother's application.

Since the case commenced, Father, who lives in Montgomery, Lycoming County, Pennsylvania, married T.S. ("Stepmother"). Together, Father and Stepmother have three children: a son, a daughter, and an unnamed child who was due in August 2019. Father's job varies between first and second shift.

Mother lives in Williamsport, Lycoming County, Pennsylvania, with her boyfriend, C.S., and their son and daughter. At this time, the parties live approximately 20-25 minutes apart. The parties exchange custody on a week-to-week basis each Monday, and both take Child to school in Williamsport. Mother works three days per week, 8:00 a.m. until 5:00 p.m., with a flexible schedule.

Following a custody trial in December 2009, the court entered an order granting shared legal custody to both parents, primary physical custody to Mother, and partial physical custody to Father, with periods of custody Friday evening to Sunday evening, and Wednesday evenings. *See* Custody Order, 12/1/09, at 1-8.

Father subsequently filed a petition for emergency custody. On March 21, 2012, the court granted Father primary physical custody of Child. *See* Order, 3/21/12, at 1. Approximately one month later, following a hearing, the court reinstated the original custody order. *See* Order, 4/19/12, at 1.

Shortly thereafter, Father again filed a petition for emergency custody. The court granted Father temporary sole physical custody until a hearing could be held. *See* Order, 5/29/12, at 1. On June 6, 2012, the court reinstated the

- 2 -

December 1, 2009 custody order, pending a custody trial. *See* Order, 6/6/12, at 1.

Following a custody trial on June 26, 2012, the court entered a custody order granting shared legal custody to both parents and shared physical custody on a week-to-week basis. *See* Custody Order, 6/27/12, at 1-9. The parties subsequently filed numerous petitions. Significantly, in December 2012, the court found Mother in contempt of the custody order. *See* Order, 12/3/12, at 1. In July 2013, the court found Father in contempt of the custody order. *See* Order, 7/8/13, at 1.

In August 2013, Mother sought two modifications of the custody order. In September 2013, following a custody conference, the court scheduled a pre-trial conference and held custody would be established per the June 2012 custody order, with agreed upon modifications to cover Child's medical appointments, dance classes, and schooling. *See* Order, 9/16/13, at 1-4. On January 16, 2014, Mother did not attend the pre-trial conference, and the court scheduled a custody trial to be held in March 2014. *See* Order, 1/16/14, at 1.

After the custody trial, and following the filing of Mother's petitions for modification and Father's notice of relocation, the court entered a custody order. *See* Custody Order, 4/3/14, at 1-11. The order granted the parties shared legal custody and shared physical custody on a week-to-week basis if Father returned to Lycoming County. *See id.*

In May 2014, Mother filed a petition seeking to find Father in contempt of the custody order and for modification of the custody order, and, in June 2014, Mother filed a petition seeking modification of the custody order. The court dismissed her petition for contempt. *See* Order, 6/2/14, at 1.

Three days later, Mother filed a petition for emergency custody, accusing Father of sexually abusing Child. *See* Petition, 6/5/15, at 1-3. The court granted Mother temporary physical custody of Child, pending a hearing. *See* Order, 6/5/14, at 1. Father requested that a guardian *ad litem* be appointed for Child. *See* Motion, 6/12/14, at 1-4. On June 16, 2014, the court found Mother did not meet her burden in proving that Father was a clear and present danger to Child, and reinstated the custody order. *See* Order, 6/16/14, at 1.

That same day, Father filed a petition seeking counsel fees, costs, and expenses from Mother pursuant to 23 Pa.C.S. § 5339. Father claimed that Mother had instructed Child to lie about the alleged sexual abuse in an attempt to gain primary custody of Child as well as her social security payments. *See* Motion, 6/16/14, at 1-3. The court granted Father's motion, finding Mother had made her accusations of sexual abuse in bad faith, and assessed Mother half of the fees sought. *See* Order, 11/3/14, at 1-7. Mother appealed; this Court dismissed the appeal. *See **S.B.B. v. J.E.B.-S.**,* 2037 MDA 2014 (Pa. Super., filed April 1, 2015) (unpublished memorandum).

Shortly thereafter, Father filed a petition seeking to modify the custody order, seeking, among other things, to have Child enrolled in counseling. *See*

Petition, 5/4/15, at 1-3. The court treated Father's petition as a petition seeking special relief, and ordered, among other small adjustments, that Child attend counseling. *See* Order, 6/11/15, at 1-3.

A little over a month later, Father sought a finding of contempt against Mother for violation of the custody order. *See* Petition, 7/31/15, at 1-2. The court found Mother in contempt but imposed no penalty. *See* Order, 8/25/15, at 1-2.

In September 2015, Mother filed a petition for special relief as Father was attempting to bring a levy against her car in order to collect his attorney's fees. *See* Petition, 9/29/15, at 1-2. The court dismissed her petition. *See* Order, 10/8/15, at 1.

The next day, Father filed a petition for contempt against Mother, who was refusing to add Father to Child's insurance and return Child's clothing to Father. *See* Petition, 10/9/15, at 1-2. The court itself called the insurance company in open court to resolve the issue, and did not enter a finding of contempt; however, it cautioned Mother that a failure to cooperate in the future with reasonable requests would be unwise. *See* Order, 11/18/15, at 1-2.

After Thanksgiving, Mother filed petitions seeking special relief and a finding of contempt, and averring that Father was violating the holiday custody order. *See* Petition, 11/30/15, at 1-3; Petition, 12/1/15, at 1-3. Mother filed contempt petitions twice more in December. *See* Petition, 12/11/15, at 1; Addendum, 12/28/15, at 1. While those petitions were pending, Father filed

a petition for special relief, averring that Mother was not cooperating with Child's counselor's recommendation for mobile therapy. *See* Petition, 2/23/16, at 1-2.

The court subsequently dismissed Mother's contempt petitions and found that Father was correctly exercising his periods of custody. *See* Order, 3/2/16, at 1-2. Additionally, the court ordered that Child participate in mobile therapy as recommended by her counselor, and that both parents comply with any recommendations made as a result of mobile therapy. *See id.*, at 1.

Father filed for contempt two months later, averring that Mother was not bringing Child to therapy and was in violation of the custody order. *See* Petition, 5/13/16, at 1-2. Mother failed to appear at the contempt hearing on July 7, 2016, and the court found that Mother was in contempt of the custody order and various other court orders. As a result, the court ordered Mother to appear before the court, and sanctioned her $200.00, the cost of Father's filing fees. *See* Order, 7/7/16, at 1-2.

Father again filed for contempt later in July, averring that Mother was not cooperating with the custody order, was not exchanging Child's hearing aid equipment, and was missing therapeutic appointments. *See* Petition, 7/18/16, at 1-2.

The most recent custody order was entered on August 10, 2016, to encompass varying changes based upon interim orders entered by the court; the court granted the parties shared legal custody and shared physical custody on a week-to-week basis. *See* Custody Order, 8/10/16, at 1-11. Five days

later, the court again found Mother in contempt for failure to cooperate with the extremely detailed custody order. *See* Order, 8/15/16, at 1-3. The court again sanctioned Mother $200.00, ordered her to provide Father make-up custody time, and imposed a suspended sentence upon Mother. *See id.*

Two weeks later, Mother filed a petition for special relief, arguing that the make-up custody time ordered by the court would result in Child's remaining with Father for twenty-one days. *See* Petition, 8/29/16, at 1-2. The court denied this petition. *See* Order, 8/30/16, at 1.

In late September, Mother filed a petition for special relief. However, the petition was dismissed after both parties failed to appear. *See* Order, 10/7/16, at 1.

The docket stayed quiet until Mother next filed a petition for contempt June 2017, averring that Father was not complying with the custody order. *See* Petition, 6/15/17, at 1. The court dismissed her petition. *See* Order, 6/23/17, at 1.

There was another period of relative peace until Mother filed a petition for special relief on January 6, 2018, requesting that Child be able to attend a Girl Scout event and dance recitals and dress rehearsals during Father's custody time. *See* Petition, 1/6/18, at 1-2. The court granted the petition and allowed Father custody time in return. *See* Order, 2/5/16, at 1-2.

Two months later, Father filed a petition seeking modification of the custody order, requesting that Child be allowed to switch school districts and attend school in Montgomery rather than Williamsport. *See* Petition, 4/11/18,

at 1-2. The court scheduled a hearing on the petition and appointed Patricia A. Shipman, Esquire, as guardian *ad litem* for Child. **See** Order, 5/18/18, at 1-2. In early July, Attorney Shipman submitted an extensive report on Child's progress, feelings, and wish to remain in the current custody arrangement. **See** Report, 7/2/18, at 1-11. Following a hearing, the court ordered that Child remain in Williamsport school district. **See** Order, 7/17/18, at 1-8.

In December 2018, Mother filed a petition for special relief, averring that Father was not taking Child to dance classes as a punishment for doing poorly on math tests. **See** Petition, 12/17/18, at 1-2. The court dismissed the petition as extracurricular activities were governed by the August 10, 2016 custody order. **See** Order, 1/30/19, at 1.

The most recent issue arose after Father was accepted to the Pennsylvania State Police Academy, a twenty-eight week program beginning on September 30, 2019. The Academy is located in Hershey, Pennsylvania, approximately two and one-half hours from Williamsport. Upon completion, Father would be stationed at a Pennsylvania State Police Barracks, of which there are five or six located within one hour of his current residence.

On May 16, 2019, Father filed a petition to modify the custody order, requesting that the shared custody schedule remain the same, with Stepmother providing the care for Child during Father's week of custody in his absence. **See** Petition, 5/16/19, at 1-2. Mother objected to the petition and requested Child be placed in her custody while Father attended the Academy, with provisions to allow Child to see Father when he is available.

The parties appeared before the court for a hearing on the petition on July 16, 2019. Father and Mother both appeared unrepresented, and testified on their own behalves; Father, additionally, presented the testimony of Stepmother. At the beginning of the hearing, the court informed Mother and Father that it would be treating the petition as a petition for special relief, since it was a temporary and limited issue. *See* N.T., 7/16/19, at 7-9. Mother did not object. *See id.*

Father testified that he has a verbal admittance to the State Police Academy and believed he would begin in September 2019 and would last 28 weeks. *See* N.T., 7/16/19, at 2-3. Father would stay at the Academy in Hershey, Pennsylvania, full time during that time. *See id.* at 3. Father would be allowed to visit home on alternating weekends but did not yet know his schedule. *See id.* at 3-4. Father believed he would remain stationed near his home in Montgomery, but did not have confirmation. *See id.* at 4-5. Father testified that, every day, Stepmother drives Child and her half-siblings to school and would continue to do so in his absence. *See id.* at 6-7.

Father testified regarding his concerns for Child's mental health and behavior, namely, that she suffers from an adjustment disorder. *See id.* at 10-13. Child needs consistency and has difficulty with change, and is already suffering from significant behavioral issues at Mother's house. *See id.* During several outbursts, Child threatened suicide and self-harm, and Mother reached out to Father for help. *See id.* at 11. Father expressed concern that Mother could not handle Child alone. *See id.* Father expressed concerns with

Mother's decision-making because, when Child was making suicidal threats, Child's therapist recommended taking her to the emergency room and Mother did not take her. *See id.* at 36. Rather, Mother suggested "PRN medications," *i.e.*, as needed, to "chill someone out." *See id.* at 37.

Father requested that the custody schedule remain the same, except that once he is given his leave schedule, he could have Child on the weekend he is home and that, once a month, Stepmother could pick up Child and take her to the Academy to visit Father. *See id.* at 13-14. Father also requested that custody communication go through Stepmother, as he would not have access to a phone at the Academy. *See id.* at 14.

Father testified that Child is very close with her siblings at Father's house. *See id.* at 35. Father stated that Child does not have any suicidal ideation or "freak outs" at his home. *See id.* Father stated that Child will say nasty things about his home to Mother, and Mother's home to Father, to "stir things up." *See id.* at 37-38. Father testified that, while he has given Mother extra time in the past, Mother always wants more time, and Father would like to spend time with Child, too. *See id.* at 38.

Mother testified that she is employed three days a week from eight to five at a fencing company. *See id.* at 15. With regard to Child's adjustment, Mother testified that, partially due to her adjustment disorder, Child has had a hard time adjusting to the week on/week off schedule. *See id.* at 16-17. According to Mother, Child is closer to her half-siblings at Mother's house than she is at Father's. *See id.* at 16. Mother stated that Child struggled for the

first time academically at school. *See id.* at 17. Mother argued that she could handle Child alone, and had attempted to talk to Father about difficulties with Child. *See id.* at 20.

Mother requested that the court consider, as a matter of record, that Stepmother hit Mother with her car. *See id.* at 18. Mother also stated that Stepmother and "anybody and everybody who has ever done a custody exchange with our daughter" has been "threatening, cursing, et cetera" in front of Child. *See id.* Mother attempted to introduce the concerns of Child's therapist, but had not brought any reports with her to court. *See id.* at 21.

Mother argued that it was important for Child to see her Stepmother and half-siblings, but that Child should be with her the majority of the time unless Father was home for the weekend. *See id.* at 26-28. Mother expressed concerns that Stepmother would be able to care for Child with two small children and a newborn on the way. *See id.* at 28. Mother accused Father of not being cooperative with the spirit of the custody order. *See id.* at 32.

Stepmother testified regarding her daily routine that, during Father's shift schedules, she often performs alone. *See id.* at 40-43. Stepmother testified that it is an easy routine, and she has a high tolerance for stress. *See id.* at 42-43. Each day, Child's younger siblings wake Stepmother up at 6:00 a.m. and she then goes to wake Child. *See id.* at 40. They eat breakfast as a family, get in the car, and have a conversation while driving Child to school in Williamsport. *See id.* Stepmother runs errands in town and takes

the younger children back to the house until it is time to pick up Child from school. *See id.* at 40-41. Child does her homework first and, if the weather permits, goes to play outside; if the weather is not favorable, Child remains at home and plays with her younger siblings before having dinner as a family. *See id.* at 42. Child showers every night and goes to bed by 9:00 p.m. *See id.* at 42-44.

Stepmother testified she has been able to take all three children to do fun activities, also on her own. *See id.* at 46-48. Stepmother has taken the kids to a park, to get ice cream, to a party, to the beach for Child's birthday, and to the zoo at Lake Tobias. *See id.* Stepmother does not anticipate a baby would make her routine more difficult; she has no current issues caring for Child and two young children. *See id.* Stepmother testified that she has a support group within walking distance of her home that includes her sister and brother-in-law, her brother-in-law's mother, and her parents. *See id.* at 43.

Stepmother testified that she has had issues with Mother and individuals Mother sends to pick Child up for custody exchanges. *See id.* at 49-53. Child feels pressure from Mother not to communicate with Stepmother. *See id.* Additionally, there have been issues with the custody exchanges even recently. *See id.* An older man unfamiliar to Stepmother came to the house twenty minutes early for the exchange and began banging loudly on the door, scaring the children. *See id.* Although Stepmother immediately told Child to go and get ready to leave, the man made a remark about the doorbell not

working. *See id.* Stepmother stated she did not know the man, and Mother refuses to text her about custody exchanges. *See id.*

Stepmother denied hitting Mother with her car. *See id.* at 53-55. She testified that she remembers the incident well, because, on that day, Child had lice. *See id.* Stepmother picked Child up from daycare, got Child into the car, and said "thank you" when Mother gave Stepmother Child's lice cap. *See id.* Mother got very angry and forced her way half into the car, got very close to Stepmother's face, and was yelling and spitting on her. *See id.* Child was watching the whole incident and appeared "freaked out." *See id.*

Stepmother said, "You need to get out of my car," but that only made Mother angrier, and she began cursing. *See id.* Stepmother repeated her request that Mother get out of the car, and noted that Child was watching. *See id.* Stepmother "bumped the car a little bit," and Mother finally got out of the car, saying something about Stepmother having run her over. *See id.* The whole incident was witnessed by a daycare employee. *See id.*

When Stepmother returned home, Father asked if she wanted to report the incident to the police, but Stepmother declined, even though she was upset Mother had done this in front of Child. *See id.* However, after receiving a call from the police station, where Mother had reported that Stepmother hit her with a car, Stepmother gave the police her side of the story. *See id.* Stepmother testified that Child also remembered the incident "the right way" and that the police were able to interview the daycare employee. *See id.* Stepmother was not arrested or cited in relation to the incident. *See id.*

Child testified *in camera*. ***See id.*** at 65-73. Child testified that she likes her current custody arrangement because it is equal for her, and because there are different things she likes about each home. ***See id.*** At Mother's home, Child enjoys playing on her electronic tablet, and, at Father's home, Child enjoys playing outside. ***See id.*** Child testified that she did not want Father to go to the Academy, and that it would be fine to stay with Stepmother and her siblings for a week while Father is not at home. ***See id.***

However, it "wouldn't be the same" and would be a big change, which is a problem for Child. ***See id.*** Child also testified that she is concerned that, with Father gone, fighting between Mother and Stepmother would occur no matter what the court decided. ***See id.*** Child testified that she would like to stay with Mother but wants to see her siblings and meet the new baby. ***See id.*** Child testified that she would like to stay with Father two weekends a month Friday through Sunday. ***See id.***

Following the hearing, the court held the matter under advisement until it issued an order and opinion. ***See*** Order and Opinion, 7/23/19, at 6-8. The court ordered that the Custody Order of August 10, 2016, remain in full effect with modifications during Father's time in the Academy. ***See id.***

Essentially, during Father's scheduled periods of custody, Child will remain in Father's home with Stepmother and her siblings. However, any weekend Father will be home or Child will be going to visit Father, Child will be at Father's home the entire weekend; on all other weekends, Child will remain with Mother. ***See id.***

The Order also provided for birthdays and holidays. ***See id.*** The Order provided that Mother and Stepmother must communicate directly with each other in regard to issues concerning Child. ***See id.*** If legal custody issues must be addressed, Mother and Stepmother will discuss the issue, and Stepmother will obtain Father's position as soon as she is able. ***See id.*** The court noted it was not granting Stepmother legal custody, but utilizing her as a spokesperson on behalf of Father in his absence. ***See id.***

Mother timely filed a notice of appeal on August 20, 2019, but did not file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court issued an opinion pursuant to Pa.R.A.P. 1925(a) on September 3, 2019. Mother filed her Pa.R.A.P. 1925(b) statement on September 11, 2019.

On appeal, Mother raises the following issues for our review:

1. Did the trial court err in treating [Father's] petition for modification as a petition for special relief?

2. Did the trial court err by not following the presumption that custody should be with a parent over a third party?

3. Did the trial court by grouping [*sic*] child's [stepmother] and mother together?

4. Did the trial court err by ignoring the presumption favoring the mother over the [stepmother]?

5. Did the trial court err by failing to create a full and complete record in order to fully address the child's best interest?

6. Did the trial court err by failing to address and give appropriate weight to the testimony of [Stepmother] that evidences contempt and disrespect for [M]other?

7. [Did the] trial court err[] by failing to address and give inappropriate weight to the testimony and evidence presented of [Father's] inability and refusal to co-parent with [M]other?

8. Did the trial court err by failing to consider the child's emotional wellbeing and the metal [*sic*] ramifications of [M]other having to share custody with [Stepmother] while [F]ather is absent at the State Police Academy[?]

9. Did the trial court err by ordering [Stepmother] to custody of child [*sic*] and then later on in that same order, expressly state that this [stepparent] has no legal custody rights?

10. Did the trial court err by employing the ideal "utilizing step-mother as a spokesperson on behalf of [F]ather in his absence["]?

11. Did the trial court err by failing to consider the already existing matter of record between [M]other and [Stepmother] as it specifically relates to [Stepmother] striking [M]other with a motor vehicle?

12. Did the trial court err by focusing on issues of conflict between [M]other and [C]hild?

13. Did the trial court err by failing to resolve this issue before [F]ather left for State Police Academy?

14. Did the trial court err by not avoiding the appearance of impropriety?

15. Did the trial court err by not acting in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary?

*See* Mother's Brief at unpaginated 4-6 (unnecessary capitalization omitted).

Prior to determining the merits of Mother's appeal, we must first determine whether she has preserved her issues for review. ***See*** ***Commonwealth v. Wholaver***, 903 A.2d 1178 (Pa. 2006) (enforcing waiver

of appellant's issue due to failure to file a timely statement of matters complained of despite appellee's abandonment of waiver argument).

Pa.R.A.P. 1925(a)(2)(i) requires an appellant in a Children's Fast Track matter to submit a Concise Statement of Errors Complained of on Appeal along with the Notice of Appeal. **See** Pa.R.A.P. 1925(a)(2)(i). Mother did not comply with this rule but, instead, filed her notice of appeal without a concise statement on August 20, 2019. The court issued an opinion pursuant to Pa.R.A.P. 1925(a) on September 3, 2019, and noted that, due to Mother's failure to file her statement, the court was unable to discern the issues Mother sought to appeal.

Although Mother violated Pa.R.A.P. 1925(a)(2)(i) by failing to file a concise statement of errors complained of on appeal concurrently with her Notice of Appeal, Mother filed a Concise Statement less than one month later. As there is no assertion of any prejudice, we do not quash or dismiss her appeal. **See In re K.T.E.L.**, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a Rule 1925(b) statement concurrently with a children's fast track appeal is considered a defective notice of appeal, to be disposed of on a case-by-case basis, and declining to quash or dismiss the appeal where there is no prejudice to the other parties as a result of the late filing).

We next turn to the Concise Statement itself, as this Court has found waiver in cases of voluminous Concise Statements as well:

> Our law makes it clear that Pa.R.A.P. 1925(b) is not satisfied by simply filing any statement. Rather, the statement must be "concise" and coherent as to permit the trial court to understand

the specific issues being raised on appeal. Specifically, this Court has held that when appellants raise an "outrageous" number of issues in their 1925(b) statement, the appellants have "deliberately circumvented the meaning and purpose of Rule 1925(b) and ha[ve] thereby effectively precluded appellate review of the issues [they] now seek to raise." We have further noted that such "voluminous" statements do not identify the issues that appellants actually intend to raise on appeal because the briefing limitations contained in Pa.R.A.P. 2116(a) makes the raising of so many issues impossible. "Further, this type of extravagant 1925(b) statement makes it all but impossible for the trial court to provide a comprehensive analysis of the issues."

*Tucker v. R.M. Tours*, 939 A.2d 343, 346 (Pa. Super. 2007) (citations omitted) (finding waiver of issues where appellants filed a concise statement consisting of sixteen pages, 76 paragraphs, and exhibits). Mother's statement is not concise as it consists of three pages and fifteen discrete issues. However, as noted, the trial court did not have an opportunity to respond to Mother's statement. As a result, it is not immediately clear whether the statement was too voluminous as to preclude meaningful review.

We therefore turn to Mother's brief itself. "Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017); *see also Estate of Haiko v. McGinley*, 799 A.2d 155 (Pa. Super. 2002) (appellant must support each issue raised by discussion and analysis of pertinent authority; without discussion of law in appellate brief, appellant hampers this Court's review and risks waiver; "It is not this Court's function or duty to

become an advocate for the appellant"); **see also In re Estate of Whitley**, 50 A.3d 203, 206-07 (Pa. Super. 2012) (reiterating general rule that failure to cite relevant supporting legal authority constitutes waiver of claim on appeal).

> Rule 2101 provides:
>
> Briefs and reproduced records shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed, and, if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed.

Pa.R.A.P. 2101.

We have held that an appeal may be dismissed and/or quashed where the deficiencies of the appellant's brief are such that we are unable to conduct a meaningful review. **Karn v. Quick & Reilly, Inc.**, 912 A.2d 329, 337 (Pa. Super. 2006). While this Court construes the filings of a *pro se* litigant liberally, "any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal training will be his undoing." **Wilkins v. Marsico**, 903 A.2d 1281, 1284–85 (Pa. Super. 2006) (finding sufficient grounds to quash appellant's *pro se* appeal due to deficiencies in his brief, but ultimately declining to do so).

We note with disapproval Mother's deficient brief. Mother's brief does not contain separate sections for each of her fifteen issues. Of Mother's eleven-page, unpaginated brief, three pages contain Mother's statement of questions involved and two pages contain the entirety of her argument.

Mother cites to no authority to support her claims. Mother does not cite to the appropriate place in the record to support her claims. Rather, Mother presents a disjointed and conclusory argument without meaningful substance, failing to address the majority of the issues presented in her statement of questions, and citing to facts that are not in the record.[2] Accordingly, due to the deficiencies in Mother's brief, we conclude that she has waived all of the issues she seeks to present. **See In re W.H.**, 25 A.3d at 339 n.3; **see also M.Z.T.M.W.**, 163 A.3d at 465-66; **Estate of Haiko**, 799 A.2d at 155.

However, even if not waived, Mother's challenge to the trial court's order would be without merit.

The scope and standard of review in custody matters is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

---

[2] For example, Mother states, without evidence, that "ex-parte communication between Father and the Judge, and members of the Judge['] office have affected this case." **See** Mother's Brief at unpaginated 10. Similarly, Mother requests, without citation to any portion of the record or any legal authority, that this Court disqualify the trial court based upon the conclusory statement that "her bias is showing after repeated issues before her where she is partial to Father. . ." **See id.**

With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

***M.J.M. v. M.L.G.***, 63 A.3d 331, 334 (Pa. Super. 2013).

Section 5328(a) sets forth the sixteen best-interest factors that the trial court must consider in making an award of custody. ***See E.D. v. M.P.***, 33 A.3d 73, 79-80 n.2 (Pa. Super. 2011). "All of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." ***J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis omitted). As such, the record must indicate that the trial court considered all the factors. ***See id.***

However, the factors are required to be addressed only where the order impacts an award of custody, and does not merely deal with a discrete and distinct issue. ***See S.W.D. v. S.A.R.***, 96 A.3d 396, 403 (Pa. Super. 2014). In ***S.W.D.***, the Court observed that

[i]t is also true that resolution of an otherwise ancillary matter may affect a form of custody and require consideration of the [Section] 5328(a) factors. For instance, the choice of a child's school may factor into a trial court's decision to award a form of custody when the trial court is addressing a request to establish or change legal or physical custody in connection with the choice of school. One parent in a custody dispute may argue that he or she is entitled to primary physical custody because his or her residence has much better schools. On the other hand, many times—like here—these items may appear as independent, discrete issues[,] advanced by motion or petition[,] that do[ ] not require a change in the form of custody. Although any decision requires consideration of the child's best interest, only the former situation requires consideration and application of the § 5328(a) factors.

- 21 -

*See id.* at 403; *see also M.O. v. J.T.R.*, 85 A.3d 1058, 1063 (Pa. Super. 2014) (where trial court does not make an award of custody, but modifies a discrete custody-related issue, it does not need to address the sixteen statutory factors when determining child's best interest).

In the instant case, the trial court correctly treated the petition as a discrete, custody-related issue and accordingly, was not required to fully detail the sixteen custody factors. *S.W.D.*, 96 A.3d at 403. The "discrete custody-related issue" was of how custody would be handled while Father attended the Academy; the issue would be moot after Father graduated the Academy in twenty-eight weeks. The court did not grant any form of custody to Stepmother but, instead, specified the manner in which Stepmother should communicate with both Mother and Father to ensure that issues of legal custody were handled appropriately. Accordingly, the court did not need to consider the sixteen statutory factors.

With regard to its reasoning, the court observed

Based upon the significant history of animosity in this case and based upon the need to maintain as much stability and consistency for [Child] as possible during the 28 weeks Father will be at the State Police Academy, the [c]ourt will grant Father's request. After speaking with [Child], it is clear that she is bonded to members of Mother's household just as much as she is to members of Father's household. [Child] does not want her [f]ather to go to the Academy as she does not want to be away from him for that long. [Child]'s life will be disrupted enough by Father's absence. By maintain[ing] the week-to-week schedule in each home, [Child] will at least be able to maintain some consistency despite Father's absence.

> [Child] is the most worried about her Mother and [Stepmother] fighting while Father is away. Regardless what schedule the [c]ourt puts in place, Mother and [Stepmother] will need to communicate regarding [Child].

Trial Court Order, 7/23/19, at 6.

We see no error in this conclusion. The court considered what was in the best interests of Child – namely, as much stability and consistency as possible. *See S.W.D.*, 96 A.3d at 403. Based upon the record, this conclusion was not unreasonable, given the history of animosity between the parties, Child's adjustment disorder, and the temporary nature of the order. *See M.J.M.*, 63 A.3d at 334. Accordingly, we affirm.

Order affirmed. Application to obtain transcript denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/21/2020

- 23 -